IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

ROGER SHUFFIELD                                                           PLAINTIFF

v.                          Civil No. 6:06-cv-06015

CAPTAIN STEED, Garland County Detention
Center Administrator; DEPUTY THREADGILL;
DEPUTY SHIRLEY; DEPUTY
STRICKLAND; DEPUTY COGBURN; and
CORPORAL BRANSTETTER                                                      DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

The Plaintiff, Roger Shuffield, (hereinafter "Shuffield" or "Plaintiff") filed this civil rights

action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.  Pursuant to the

provisions of 28 U.S.C. § 636(b)(1) and (3) (2005), the Honorable Robert T. Dawson, United States

District Judge, referred this case to the undersigned for the purpose of making a report and

recommendation.

Shuffield is currently incarcerated in the Arkansas Department of Correction.  The events at

issue in this lawsuit occurred while he was incarcerated at the Garland County Detention Center.

Shuffield contends his constitutional rights were violated in two ways during his incarceration at the

GCDC.  First, Shuffield contends he was denied adequate medical care.  Second, Shuffield contends

excessive force was used against him.

An evidentiary hearing was conducted on October 30, 2007.  At the conclusion of the

hearing, the matter was taken under advisement pending preparation of this report and

recommendation.

-1-

## 1. Background & Evidence Presented

At the evidentiary hearing, the court heard the testimony of the following witnesses:  (1) Roger Shuffield; (2) Kevin Allbright; (3) Terry Threadgill; (4) Tyson Dunn; (5) Mel Steed; (6) Bennie Strickland; (7) Scott Shirley; (8) Matthew Cogburn; and (9) Ronnie Branstetter.

The events that are the subject of this lawsuit occurred during two separate periods of time during which Shuffield was incarcerated at the Garland County Detention Center (GCDC).  The first period of incarceration was from October 4, 2005, until October 24, 2005.  *Defendants' Exhibit* 10.  The second period of incarceration was from March 24, 2006, until March 29, 2006.  *Defendants' Exhibit* 17.  For purposes of discussion, I will summarize in the first person the testimony given at the evidentiary hearing.

### Roger Steven Shuffield

I'm sixty years old.  I'm currently incarcerated at the Arkansas Department of Correction (ADC), Pine Bluff Hospital Unit.

I turned myself into the county jail [the GCDC] on October 4, 2005, when I found out there was a failure to appear warrant out on me.  I had been in the Veteran's Administration Hospital because of TIAs.[1]  I was booked in on charges of violation of the Arkansas Hot Check Law and one count of failure to appear.  *Defendants' Exhibit* 10.  In 1975 I was convicted of a felony–strong arm robbery.

---

[1] A Transient Ischemic Attack occurs when the blood supply to part of the brain is briefly interrupted.  The symptoms occur suddenly and are similar to a stroke but do not last long usually disappearing within a short period of time although they may persist for up to twenty-four hours.  Symptoms may include numbness or weakness in the face, arm or leg, especially on one side of the body; confusion or difficulty in talking or understanding speech; trouble seeing in one or both eyes; and difficulty with walking, dizziness, or loss of balance and coordination.  NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE, *Transient Ischemic Attack Information Page*, http://www.ninds.nih.gov/disorders/tia/tia.htm (accessed 11/5/2007).

On October 7th I was dizzy and nauseated.  I submitted a medical request.  *Defendants'*

*Exhibit* 12; *Plaintiff's Exhibit* 1 at page 1.  I wrote:  "ear aches, chronic low back pain, tooth aches

& can['t]t sleep.  I am dizzy when standing & set blurred vision."  *Id.*  Where the form asks for date

of the problem, I wrote:  "allways."  *Id.*

Although I see Nurse Harmon's notes on the bottom of the form are dated October 7th, I

don't believe I saw Harmon until a couple of days later.  I was taken to St. Joseph's Hospital later

that night.  I had a TIA.

I never saw this hold form.  *Defendants' Exhibit* 13.  I was left at the hospital by the deputy

and was told that the judge had okayed it.  I didn't realize I was still in custody.  I left St. Joseph's.

I got in a car.  I went down the road to have a cigarette.

I got stopped by a deputy.  I was arrested on October 8th and charged with escape.

*Defendants' Exhibit* 14.  I was taken back to the detention center.  The escape charge was

subsequently dismissed.

I was placed in cell 1B.  I began having symptoms of a TIA again–numbness and dizziness.

A cell-mate called for help.  I was in a cell with two other people.  Shirley and Cogburn came

to the cell to move me to an observation cell.  They told me to get up.  I told them I couldn't.  It was

hard to communicate at all.   I was mentally aware but I was not able to verbalize.  I didn't have

control over my arms and legs.

Shirley and Cogburn pulled me out of the cell.  Strickland came up.  Shirley hit me in the side

of the head.  He hollered for me to get up.  He said you Mother F----- get up.  He said you are going

to walk up those stairs.  He said you get up.  He hit me two or three times.  I believe he struck me

-3-

three times.  My mind was still sharp.  He struck me with a closed fist.  He had a glove on.  He hit me in the head.  A trustee was there.  Cogburn was there.  I had a heel mark on my knee.

Shirley and Cogburn dragged me up the stairs.  They tossed me into a holding cell.  Shirley was yelling that it was his jail and he was not going to put up with escapes from his jail.  I didn't see anyone for two or three days.

Lt. McMurrian asked me to write a statement.  I wrote it out.  I requested a copy of the statement in discovery.  It was not produced.

After I got back to my cell, I asked to call my personal doctor.  Dr. Irwin is my doctor at the Veteran's Administration Hospital in Hot Springs.  I had a stroke.  TIA's are called mini-strokes.  Dr. Irwin is my general doctor.

 On October 11th I appeared in Garland County Circuit Court and pled guilty to the possession of firearms by certain persons.  *Defendants' Exhibit* 11.  I was subsequently sent back to the ADC.  I believe this was two or three days later.  It may have been the following day that I was transported.  My ear was bleeding.  I still had marks and contusions noted by the prison.  The Defendants' records show I was transferred to the ADC on October 24th.  *Defendants' Exhibit* 10.

On March 24, 2006, I came back to the GCDC.  *See Defendants' Exhibit* 17.  The second incident occurred on March 27th.  I was in cellblock 2B in the day-room on the floor.  Threadgill came in and told me to go into a cell.  I was within two or three feet of the table.

At the time, I was using a cane and was not able to get up and down from the floor very well.  I was standing up and on my way towards the cell.  I didn't say I wouldn't go in the cell.  I said I wanted to clean the cell before I went in there.  I told Threadgill the floor in the cell was filthy and could I get a mop.

-4-

Threadgill took his glasses off and laid them on the table.  He then leaned in and hit me.  He hit me once in the head with a closed fist.

Threadgill threw me onto the bunk inside the cell.  He cold cocked me.  I didn't raise a hand.  I was written up for threatening an officer or intimidating an officer.

There were two or three other inmates there.  Kevin Allbright was one of them.  Allbright was locked down at the time.  He was standing at the window of his cell.  There was another inmate in the same cell with him but that inmate said he couldn't see.

There was a camera in the cell-block that should have recorded what occurred.  I was initially told there was no tape.  Later I saw a reference to a tape.  I asked for the tape and it was never produced.

I was transferred back to the ADC.  I believe it was two days later when I was written up.  *Defendants' Exhibit* 17 (transfer on March 29th).  I went straight to the nurse and building major.  Note was made of the bruises on my back and blood running out of my ear.

I requested medical care while I was at the jail several times.  They took my money for medication and then they didn't provide me with the medication.  *Plaintiff's Exhibit* 1 at pages 5-9.  I was seen by the nurse at the jail and supposedly put on the list to see the doctor but I was never seen by the doctor.

Steed did not use excessive force against me.  Strickland did not use excessive force against me.  Cogburn did not use excessive force against me.  He was with Shirley when excessive force was used but I didn't see Cogburn use any force against me.

I submitted requests for medical care to Steed and Branstetter.  I spoke to Steed after the incident with Threadgill about my need for medical treatment.  I asked to call my personal doctor.

Steed said I was going to get to see the doctor and that was the end of that.  Steed sent me to see the nurse right then.  He called the nurse over and said that is the end of the situation as far as I'm concerned.

### Kevin Allbright

I was in the GCDC for two years beginning in February of 2005.  I'm taking stomach medication.  No other medication.  In March of 2006 I was taking pills for anxiety and depression.  Those medications did not cause me to have hallucinations.

I was in cellblock 2B in the jail.  It was lock-down time.  Threadgill asked Shuffield to get in cell three I think it was.  Threadgill asked Shuffield to get in the cell because there was an open bed.  There are five rooms in the cellblock.  There were more than five people in the cellblock.

I was locked down in cell two.  I was looking out the window in the cell door and the bean hole trap.  My vision was not restricted until Shuffield was placed inside cell three.  Shuffield was laying directly in front of the cell door.

Threadgill asked Shuffield to get his stuff and get in cell three.  I saw Shuffield get up.  I saw Threadgill throw his glasses off and set them on the table.  I guess Shuffield was moving too slowly.  Threadgill went to manhandle Shuffield.  Threadgill came at Shuffield.  I saw them wrestling.  I saw Threadgill throw Shuffield to the ground and then take him to the cell.  Then Dunn was there.  I don't think Dunn was there before.

Shuffield was complaining about his back.  He was already disabled and using a cane.

I was called out as a witness.  I remember making a statement.  I wrote this statement. *Defendants' Exhibit* 20.  I saw part of what happened. No one else wanted to write a statement.

-6-

Dunn said they were going to move me to 1B if I was lying.  I was given a disciplinary for lying to staff members.  *Defendants' Exhibit* 20 at page 4.  They were going to move me to population.  So I refused to go with them.  I felt frightened about going downstairs.  That would have been punishment for writing the statement.

**Terry Threadgill**

I have worked for the Garland County Sheriff's Department for two and a half to three years.  I work in the detention center.

I know Shuffield because he has been an inmate in the detention center.  I worked the swing shift in March of 2006.  The swing shift is from 3:00 p.m. to midnight.

One of my duties is to get the inmates locked down.  Lock down is at 9:00 p.m.  All inmates are locked down.  The only exception is when the detention center is overcrowded.  When the detention center is overpopulated, inmates may be on the floor in the day-room.

Lock down ends sometime in the morning.  To tell you the truth, I don't know what time that occurs.  I don't work mornings.

After lock down, we do a head count and make sure everyone is where they are supposed to be.  Cellblock 2B consists of a larger day-room with individual cells opening off of it.

Shuffield had his mattress and belongings in the day-room.  He had not been assigned to a cell.  I walked into cellblock 2B and told him there was an opening in a cell and he needed to get his stuff and move into the cell.

He started to get up.  Then he looked at me and said:  "No, why don't you make me."  I knew there was going to be a problem."  I called for assistance.  I had a radio when I went into the cellblock.  It was clipped to my belt.  I had a lapel microphone.

I didn't want my glasses to be damaged so I took my glasses off and set them on the table. He charged me.  He came at me in a swift motion.  I raised my forearm and blocked myself.  As a continuous motion, I pushed him into the cell and closed the cell door.  I did not strike him or kick him.  I waited for assistance.

I prepared a report that night.  *Defendants' Exhibit* 18.  I didn't cuss him.  He didn't say anything else–other than "make me."  I filed disciplinary charges on Shuffield.  *Defendants' Exhibit* 19 (charged with physical intimidation, disorderly conduct, and refusing to cooperate with deputies–found guilty and given thirty days lock down and loss of privileges).  I received a small cut on my arm.

I don't know why Shuffield was in cellblock 2B.  I know he had a cane.

**Tyson Dunn**

I've worked for the Garland County Sheriff's Department for four years.  I work in the detention center.

I know Shuffield.  I was involved in an investigation regarding his allegations that he was abused by Threadgill.

On March 28th I pulled Shuffield out of the cellblock for a disciplinary hearing on the charges against him.  *Defendants' Exhibits* 19 & 20.  He called witnesses.  *Defendants' Exhibits* 19 & 20 (Kevin Allbright, Warren Harris and Kevin Tapp).  Allbright had stated several times that he had seen Threadgill strike Shuffield.  I advised Allbright that if he was lying he would be moved to lock down.

I went into Allbright's cell and concluded he could not have physically seen what he said he could.  He could have only seen Shuffield's mat.  Allbright could not have seen where Shuffield and

Threadgill were.  The other inmates who had been in the cell with Allbright also stated it was not possible for them to see at the time of the incident.  *Defendants' Exhibit* 20 at page 4.

I also reviewed the tape.  I saw Shuffield stand up and walk over, run over, or charge at Threadgill.  Shuffield was very aggressive.  He ran towards Threadgill.  Shuffield was waving his arms.

### Mel Steed

I've worked for the Garland County Sheriff's Department for twenty years.  I've been the jail administrator for four years.  I'm responsible for the day to day operations of the jail.

In October of 2005 we had no video taping process.  In March of 2006 we had a video taping process.  It is a digital video recorder (DVR).  It runs continuously twenty-four hours a day.  There is a camera in each cellblock.  There is a single disc or DVD in the machine that is recorded over after ninety days.  If there is a significant event, an individual disc or DVD can be burned and kept.

The night shift sergeant and Threadgill viewed the tape of the incident involving Threadgill but they didn't make a copy.  They didn't view it as a significant event.  They didn't believe there was any evidence of wrongdoing.  After ninety days, it was automatically taped over.

I recall Shuffield asking for medical treatment one day.  I would have referred him to the nurse.  If the nurse indicated Shuffield needed further medical care, it would have been arranged.  I did not stop Shuffield from talking to his own physician.  He never asked me to call his doctor.

There are phones for the inmates to use in the cellblocks.  The telephones are restricted to collect calls except for bondsman and attorneys.  Shuffield could have asked to use the other phones.  If Shuffield had set an appointment with his doctor, we would have transported him.

### Bennie Strickland

I've worked for the Garland County Sheriff's Department for almost three years. I'm a deputy. I usually work in the back.

I was working the afternoon of October 9, 2005. I was not involved in the incident.

I did not strike, hit, or kick Shuffield. I did not see any other deputy strike, hit, or kick Shuffield. I didn't refuse Shuffield medical care or refuse him access to medical care.

I went down and assisted in gathering Shuffield's belongings and moving them to a holding cell. Shuffield was outside the cellblock on his knees with Cogburn and Shirley when I arrived.

The first line of my report is supposed to have the date October 9, 2005. *Defendants' Exhibit* 16. I didn't make the decision to transfer him to holding. Shirley and Cogburn have seniority over me.

Shuffield was in the hall. Shirley and Cogburn probably would have made the decision to move him to observation. A trustee gathered his belongings. I don't remember the trustee's name. I looked at the list of trustees who were working that day. I don't remember who the trustee was.

No one was cussing Shuffield or yelling at him. They were close to the stairwell. Cogburn and Shirley had him underneath the arms and they were helping him up the stairs. Everyone knew he had escaped the day before.

### Scott Shirley

I'm no longer working at the Garland County Sheriff's Department. I have two bad knees so I no longer work there.

In October of 2005, I was working there. I was the senior deputy. I had never encountered Shuffield before that night.

-10-

On October 9th I received a call from inmates.  The inmates reported that an inmate in A1-12 was having a seizure.  Shuffield was inside the cell in a comatose unresponsive state.  His behavior was suspicious because of what had happened the day before.

Cogburn is an emergency medical technician (EMT).  I had several years of experience in the detention center.

We were trying to communicate with Shuffield.  I was trying to get a response.  I stood over him.  I was more or less talking to him to get a response.  I tapped him on the face–just open fist–kind of a slap.  I was trying to make an assessment at the time.  I was asking him to wake up.  His eyes opened very big and he rose six to eight inches off the floor.

We decided for our own safety we should get him out of the cell.  As soon as I touched his face, his eyes opened.  We took him out into the hall.  There were thirty plus inmates in the detention center.

We radioed for Strickland to bring a trustee to get Shuffield's belongings.  I gave him two slaps to the side of his face.  I didn't lay a hand on him other than to get up to the holding cell.  Once it got as far as it did, we notified the supervisor on duty to let him decide.

### Matthew Cogburn

I work for the Garland County Sheriff's Department.  I did work in the detention center.  I now work on the road crew.

On October 9, 2005, I was a deputy in the detention center.  I didn't know Shuffield had escaped.  Shirley had seniority over me.  I don't recall the incident involving Shuffield at all.

I didn't hit or kick Shuffield.  If I had seen it, I would recall.  I didn't prevent him from receiving medical care.

-11-

I picked up requests for medical care.  When you picked them up, you signed your name, put the requests up front and they were given to the nurse.

**Ronnie Branstetter**

I've worked for the Garland County Sheriff's Department for five and one-half years.  In October of 2005 I knew Shuffield because he had been in and out of jail.

I had nothing to do with any medical request he submitted on October 7th.  I was not present during the incidents involving Shirley and Cogburn or Threadgill.  I didn't interfere with Shuffield's access to medical care.

I handle grievances that come through on my shift.  I don't handle withdrawal of money from inmate accounts.  Inmate accounts are handled by booking.

## 2.  Discussion

As noted above, Shuffield contends his constitutional rights were violated in the following ways:  (1) he contends he was denied adequate medical care; and (2) he contends excessive force was used against him on two separate occasions.

### A.  Denial of Medical Care

In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates adequate medical care. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).   This standard applies to both pretrial detainees and convicted defendants.  *See id.*   "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle  v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

-12-

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

In this case, the GCDC has written procedures for the provision of medical services to detainees and a sick call procedure. *Defendants Exhibits* 1 & 2. Detainee requests for medical care are required to be in written form. *Defendants' Exhibit* 2 at page 1.

-13-

Shuffield submitted his first written request for medical care on October 7, 2005. *Defendants' Exhibit* 12 at page 1; *Plaintiff's Exhibit* 1 at page 1.  In the space of the form where Shuffield was to write the date of the problem he wrote always.  *Id.*  In the space of the form where he was to describe the problem, Shuffield wrote he had earaches, chronic low back pain, toothaches, was unable to sleep, was dizzy, when standing and sitting, and had blurred vision.  *Id.*

He submitted a second request on October 9th.  *Defendants' Exhibit* 12 at page 2; *Plaintiff's Exhibit* 1 at page 2.  On this request he stated he had "contusions and abrasions on his [left] temple and head, some w/ pronounced toe (boot) mark[s] on outside of [left] shin (knee area)."  *Id.*  He also said he was "still having symptoms of TIA's (per hospital)."  *Id.*

He submitted his third request for medical care on October 10th.  *Defendants' Exhibit* 12 at page 3; *Plaintiff's Exhibit* 1 at page 3.  He said he had drainage from his left ear.  *Id.*  Pain and blurring of vision (primarily in his left eye) and weakness and diminishing strength on his right side. *Id.*[2]

It was not clear from the testimony when Shuffield was first seen by the jail's nurse Tommy Harmon.  The bottom of the first medical request dated October 7th contains notations dated that day from Nurse Harmon.  *Defendants' Exhibit* 12 at page 1.  However, Shuffield testified he did not see Nurse Harmon that day.  Nurse Harmon did not testify and no other witnesses' testimony addressed whether Shuffield was seen by the nurse that day.

It is undisputed that Shuffield was taken to St. Joseph's Mercy Health Center on October 7th. *Defendants' Exhibit* 13.  A hospital police hold form was completed.  *Id.*  No testimony established

---

[2]Shuffield submitted no written requests for medical care during his second period of incarceration at the GCDC in March of 2006.

what treatment was provided to Shuffield while he was at St. Joseph's. On October 8th Shuffield walked out of St. Joseph's, got into a vehicle, and left with an acquaintance. *See also Defendants' Exhibit* 14.

After he was apprehended and returned to the detention center, the following day, October 9th, Shuffield again had medical problems. A fellow inmate summoned assistance for Shuffield. Cogburn and Shirley arrived to check on Shuffield and found him unresponsive. When Shuffield responded to stimuli, he was moved to an observation cell and checked by the jail nurse the following day. *See Defendants' Exhibit* 12 at pages 2-3. The medical request forms dated October 9th and 10th, contain notations dated October 10th made by Nurse Harmon. *Defendants' Exhibit* 12 at pages 2-3; *Plaintiff's Exhibit* 1 at pages 2-3. Nurse Harmon notes that Shuffield appears to be "doing O.K." *Defendants' Exhibit* 12 at page 3; *Plaintiff's Exhibit* 1 at page 3.

On October 14th prescriptions for Erythoromycin Base 500 mg. and Aspirin Enteric 325 mg. were obtained from the Medicine Shoppe Pharmacy for Shuffield. *Defendants' Exhibit* 15; *Plaintiff's Exhibit* 1 at page 15. The medication ledgers admitted into evidence do not cover the time periods at issue in this lawsuit. *Plaintiff's Exhibit* 1 at pages 10 (4/5/2004 to 4/10/2004), 11 (1/28/2000 to 1/31/2000), 12 (3/10/2006 to 3/16/2006). Shuffield testified the medication was never dispensed to him.

I find no evidence of deliberate indifference on defendants' part. First, there is no evidence that Threadgill, Strickland, Cogburn, and Branstetter made any decisions about the medical care Shuffield should receive. Instead, these decisions were made by medical personnel at the jail and/or at St. Joseph's. *See Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the

defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility).

Second, with respect to Shirley, the only decision he made regarding Shuffield's "medical care" was to move him to an observation cell. Shuffield presented no evidence the delay in his getting medical treatment on this occasion was detrimental to his health. Rather, Shuffield maintains that Shirley used excessive force in moving Shuffield to the observation cell. This, of course, is an entirely separate issue.

Third, with respect to Steed, Shuffield bases his claim on the fact that Steed allegedly denied him permission to call his personal physical following the incident with Threadgill. Steed denies this allegation and testified that Shuffield did not request permission to phone his physician following the incident with Threadgill. Steed further testified he did not refuse Shuffield permission to call his doctor and that there were phones available for inmate use.

Shuffield maintains he had a right to call his physician under Ark. Code Ann. § 16-85-101 (2005). "Violations of state law do not state a claim under 42 U.S.C. § 1983. Section 1983 guards and vindicates federal rights alone." *Doe v. Gooden*, 214 F.3d 952, 954 (8th Cir. 2000)(internal quotation marks and citations omitted). Thus, the alleged violation of the Arkansas state statute does not necessarily equate to a violation of § 1983.

Even if I assume Steed did deny Shuffield's request to phone his physician on this occasion, this simple refusal does not amount to deliberate indifference to Shuffield's serious medical needs. Steed did not interfere with, or delay Shuffield's access to medical treatment. In fact, Steed immediately referred Shuffield to medical personnel capable of evaluating his need for medical

treatment. It was the nurse--not Steed--who evaluated Shuffield's need for medical care at that time. *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)(prison official who lacked medical expertise was not liable for medical staff's decision not to refer inmate for further medical treatment). Finally, Shuffield submitted no verifiable medical evidence that he was harmed by the denial of a consultation with Dr. Irwin. *Cf. Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)(inmate who complains about delay in medical treatment must present verifying medical evidence of detrimental effect of delay).

### *B. Excessive Force on October 9, 2005*

On October 9th, Shuffield was a pretrial detainee. It is clear the state has no right to punish pretrial detainees. *See Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989)(*citing Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979)). Excessive force claims brought by pretrial detainees are analyzed under the Due Process Clause of the Fifth and Fourteenth Amendments. *See Johnson-El*, 878 F.2d at 1048-49.

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *See Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *See Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

-17-

In this case, Shuffield testified Shirley hit him in the side of the head.  Shuffield testified Shirley struck him a total of three times with a closed fist.  As a result, Shuffield maintains he suffered contusions and abrasions on the left temple area and left knee area.  *Plaintiff's Exhibit* 1 at page 2.

In contrast, Shirley testified Shuffield was in an unresponsive state when he and Cogburn arrived at the cell on October 9, 2006.  Shirley stated he tapped or slapped Shuffield on the face, with an open hand, just enough to get a response out of him. As soon as Shuffield responded, Shirley indicated Shuffield was removed into the hallway and from there taken to an observation cell where the supervisor on duty was notified so the supervisor could decide what needed to be done.

Cogburn testified he could not recall the incident involving Shuffield.  However, had he seen Shirley using excessive force against Shuffield, Cogburn believes he would have recalled the incident.  Strickland testified that when he arrived Shuffield was already in the hallway.  Strickland only saw Shuffield being helped up the stairs.  Strickland did not see any deputy strike, hit, or kick Shuffield.

I find Shuffield failed to prove by a preponderance of the evidence that Shirley used excessive force against him.  I find credible Shirley's testimony that he used an open fist to tap or "slap" Shuffield's face in order to determine if he was responsive to stimuli.  Given the fact that Shuffield walked out of the hospital the day before and had to be apprehended and returned to the detention center, it was appropriate for detention center personnel to approach the situation with caution when they were advised of  the fact that Shuffield was once again exhibiting symptoms similar to those resulting in him being taken to the hospital on October 7th.

-18-

Although Shuffield testified his ear was still bleeding and he had marks and contusions on him when he was transferred back to prison, Shuffield presented no documentary evidence to support this contention.  Further, although he remained at the GCDC until October 24th, he submitted no requests for medical attention after October 10th and submitted no grievances regarding Shirley's alleged use of excessive force.

### C.  Excessive Force on March 27, 2007

During his second period of incarceration at the GCDC, Shuffield was in convicted status. "[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences." *Wilson v. Spain*, 209 F.3d 713 (8th Cir. 2000)(*citing Whitley v. Albers*, 475 U.S. 312, 318-322, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)). "The Eighth Amendment protects inmates from the unnecessary and wanton infliction of pain by correctional officers regardless of whether an inmate suffers serious injury as a result." *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002)(citations omitted).  The Supreme Court has held that when "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always  are violated." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (*quoting Hudson*, 503 U.S. at 6-7).   To make this determination, the court is to consider, among other things, the following factors: "the need for the application of physical force; the relationship between the need for physical force and the amount

of force applied; and the extent of injury suffered by the inmate." *Jones*, 207 F.3d at 495 (citations omitted).

The incident between Shuffield and Threadgill occurred on March 27th at lock down time–9:00 p.m. or shortly thereafter.  Threadgill came into cellblock 2B where Shuffield was on the floor in the day-room.  At the time, Shuffield had not yet been assigned to a cell.

Threadgill told Shuffield to get his belongings and move into a cell.  It is at this point Shuffield's and Threadgill's versions of what occurred differ.  Shuffield testified he was using his cane to get up from the floor, stand, and make his way towards the cell.  Shuffield asserts he didn't refuse to go to the cell but did indicate he wanted to clean the cell before he went there because the floor was filthy.  According to Shuffield, Threadgill took his glasses off, hit Shuffield once in the head with a closed fist, and threw him onto the bunk inside the cell.

Threadgill indicates that when he set his glasses on the table Shuffield charged him. Threadgill raised his forearm and blocked himself and at the sametime pushed Shuffield into the cell and closed the door.

The only eyewitness testimony offered was that of Kevin Allbright.  Allbright testified he saw Threadgill come at Shuffield and saw the two wrestling.  Allbright indicated he saw Threadgill throw Shuffield to the ground and then take him into the cell.

When he was transferred back to the ADC on March 29th, Shuffield reported being hit on his head and kicked in the back.  A health services encounter form indicates Shuffield was examined by a nurse on March 29th.  *Plaintiff's Exhibit* 1 at page 16.  A 10-12 c.m. abrasion to the left side of Shuffield's back below his kidney was noted along with swelling and redness in the area.  *Id.*  The left upper facial area was also noted to be injured near his eye and ear.  *Id.*  It was noted his ear drum

-20-

was painful on examination.  *Id.*  Puffiness on his left jaw near the temporal area was noted.  *Id.*
Note was made that his ear drum appeared to be perforated and draining.  *Id.*

I find Shuffield has failed to prove Threadgill used excessive force against him.  First, the
evidence is undisputed that Shuffield did not promptly obey Threadgill's command to move into a
cell for lock down.  Shuffield's failure to do so was largely due to his perception that the cell was
not clean.  It may be that Shuffield stumbled toward Threadgill rather than charged towards him and
that Threadgill simply reacted.  However, there is no evidence that Threadgill undertook a course
of action intended to injure Shuffield without just cause or reason or that Threadgill engaged in
extreme or excessive cruelty.  *See Howard v. Barnett*, 21 F.3d 868, 872 (8th Cir. 1994)("One acts
'maliciously' by undertaking, without just cause or reason, a course of action intended to injure
another; in contrast, one acts 'sadistically' by engaging in extreme or excessive cruelty or by
delighting in cruelty.").

Second, Shuffield was charged with, and found guilty of, disciplinary violations of
committing acts of physical intimidation, disorderly conduct, and refusal to cooperate with deputies.
At the disciplinary hearing, witnesses were called including several inmate witnesses.  According
to the notations on the disciplinary hearing report and to the hearing testimony, Allbright supported
Shuffield's version of the events while another witness, Kevin Tapp, stated he saw Shuffield come
at Threadgill.  *Defendants' Exhibit* 19.  Following the disciplinary hearing, Allbright was charged
with lying to staff members as a result of the testimony he gave at the disciplinary hearing.
*Defendants' Exhibit* 20.

Third, the injuries documented by the nurse at the ADC on March 29th could be as easily
explained by Shuffield's own conduct as by the alleged use of excessive force by Threadgill.  *Cf.*

-21-

*Brandt v. Davis*, 191 F.3d 887, 892 (8th Cir. 1999)("[I]f the complaining party's injuries are likely explained by the arrestee's own actions, the allegations cannot create a material fact issue as to whether the arresting officer used excessive force.").  Finally, I find Threadgill's testimony credible that he used only the amount of force necessary to propel Shuffield into the cell and close the cell door.  In sum, I find Shuffield failed to demonstrate that Threadgill used force maliciously and sadistically to cause harm, rather than in a good faith effort to maintain or restore discipline.

### 3. Conclusion

For the reasons stated, I  recommend that judgment be entered in the Defendants' favor and the complaint be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this 14th **day of November 2007.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE